UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OTIS JOHNSON, | ) | |
| | ) | |
| Petitioner, | ) | 16 C 2964 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| BRITTANY GREENE, Warden, Western Illinois | ) | |
| Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Otis Johnson, an Illinois prisoner serving a 35-year sentence for first-degree murder,

petitions for a writ of habeas corpus under 28 U.S.C. § 2254. Docs. 1, 56. At Johnson's request,

the proceedings were stayed for some time while he pursued successive post-conviction relief in

state court. Docs. 20, 54. Johnson's habeas petition is denied, and a certificate of appealability

will not issue.

**Background**

A federal habeas court presumes that state court factual findings are correct unless

rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Jean-Paul v. Douma*,

809 F.3d 354, 360 (7th Cir. 2015) ("A state court's factual finding is unreasonable only if it

ignores the clear and convincing weight of the evidence.") (internal quotation marks omitted).

The Appellate Court of Illinois is the last state court to adjudicate Johnson's case on the merits.

*People v. Johnson*, No. 1-06-2091 (Ill. App. May 28, 2009) (reproduced at Doc. 79-1); *People v.*

*Johnson*, 2014 IL App (1st) 130877-U (Oct. 14, 2014) (reproduced at Doc. 79-51 at 31-34). The

following sets forth the facts as that court described them, as supplemented by the trial transcript,

as well as the procedural background of the state court proceedings.

### A.      Trial Court Proceedings

Johnson and Alonzo Young were indicted on first-degree murder charges for the shooting death of Brandon Roberts.  Doc. 79-1 at 2.  The trial judge granted Young's motion to sever his case from Johnson's, but a different judge to whom the case was reassigned vacated the order, reasoning that severance was unnecessary because Johnson and Young did not intend to implicate one another in the shooting.  *Ibid*.  The case was tried to a jury in 2006.  Doc. 79-41. The prosecution presented several witnesses, including Mark Harvey, his brother Kenneth Harvey—who will be called "Mark" and "Kenneth"—David Walker, and Dreena Jackson.

Mark testified as follows.  While driving his gray Cutlass Cierra at 9:30 a.m. on May 24, 2003, Mark saw Johnson and Young at the corner of 90th Street and Marshfield Avenue. Doc. 79-1 at 2; Doc. 79-41 at 152-154.  Mark did not know Young, but he had known Johnson for five or six years and, as part of his unlicensed cab business, had given Johnson rides. Doc. 79-1 at 2; Doc. 79-41 at 153.  Johnson was wearing a "black jacket with a hoody and jeans," while Young was dressed in a "brownish-gold hoody."  Doc. 79-1 at 2.  Johnson flagged down Mark and asked for a ride.  *Ibid*.; Doc. 79-41 at 154.  Mark agreed, and Johnson got into the car while Young stayed behind.  Doc. 79-41 at 154-155.  As Mark drove down Elizabeth Street, Johnson saw someone he knew and told Mark to drive him back to 90th and Marshfield. Doc. 79-1 at 2.  When they approached that intersection, Johnson saw Young and told him to get into the car.  *Ibid*.  Mark then drove Johnson and Young toward Racine Avenue.  *Id*. at 2-3.

When Johnson saw a red Buick Regal parked in an alley between Elizabeth and Racine, Johnson stated, "there go the mother fuckin' car right there," and directed Mark to stop his car around the corner.  *Id*. at 3.  Johnson and Young exited the car, pulled their hoods over their heads, and walked through a gangway to the alley toward Roberts.  *Ibid*.  While making a U-turn, Mark heard five or six gunshots ring out from the alley.  *Ibid*.  Johnson and Young (with

their hoodies still up) then returned to Mark's car and got back in. *Ibid*. Johnson told Young, "you laid them down," and shook his hand. *Ibid*. Johnson told Mark to take them back to 90th and Marshfield, where they got out and Johnson gave Mark a few dollars. *Ibid*.

On May 28, 2003, four days after the shooting, Mark spoke with police and identified Johnson from a photo array. *Ibid*. At trial, Mark denied knowing that Johnson or Young would shoot someone and stated that he did not see either with a gun. *Ibid*. Mark admitted at trial that he had been convicted of possession of a controlled substance in 1999 and sentenced to probation. *Ibid*.

Walker testified as follows. At around 10:15 a.m. on May 24, Walker was sitting on the back porch at his residence on Racine Avenue when he heard two gunshots. *Id*. at 3-4. He looked down the alley between Elizabeth and Racine and saw a young man wearing "a gold pullover sweater with the hood pulled over his head" shoot another man several times. *Id*. at 4. Walker did not see the shooter's face. *Ibid*.

Jackson testified as follows. At 10:16 a.m. on May 24, Jackson was in the backyard of her home on Racine Avenue when she heard gunshots. *Ibid*. She took cover in her garage and heard more gunshots. *Ibid*. Jackson heard footsteps and saw a man wearing a "gray hoody" in her neighbor's gangway. *Ibid*. The man said, "[c]ome on, D," and a second person ran through the gangway toward Racine. *Ibid*. (Detective Steven Lazzara later testified that Young's middle initial was "D." *Ibid*.). Jackson did not see the second person, nor did she see the first person's face. *Ibid*. She then heard "a very loud car muffler," and she thought she saw a gray car leaving the scene. *Ibid*.

Kenneth testified as follows. His brother Mark was a recovering heroin addict who supported his habit in part with the proceeds of his cab business. *Ibid*. The car Mark drove in

2003 was "loud" and needed a muffler. *Ibid*. On May 25, the day after the shooting, Kenneth saw police officers looking at Mark's car. *Id*. at 5. On May 26, when Kenneth told Mark about the police having looked at his car, Mark said that he had given a ride to Johnson and another man, that he had heard gunshots when the pair left his car, and that afterward he had picked them up and dropped them off. *Ibid*. On May 28, Kenneth talked to police about Mark's potential knowledge of the murder and helped officers locate him. *Ibid*.

Johnson took the stand in his own defense and testified as follows. On the morning of May 24, Johnson was at his home on South Marshfield Avenue with his girlfriend, Charea. *Ibid*. He woke up around 10:00 a.m., went to the kitchen, and walked out the back door to speak with his father, Davie Johnson—who will be called "Davie." *Id*. at 6. Charea joined them for a few minutes before leaving. *Ibid*. Davie then went back into the house, and Johnson sat on the porch before taking a walk around the block. *Ibid*. Johnson denied having been near the corner of 90th Street and Marshfield that day. *Ibid*. He also denied having paid Mark to drive him anywhere, adding that he had issues with Mark, who owed him money and occasionally hassled Charea. *Ibid*.

Davie testified as follows. Davie was working on a car parked in front of his and Johnson's house at 8:30 a.m. on May 24. *Ibid*. From the front of the house, Davie could see all four corners of 90th Street and Marshfield Avenue. *Ibid*. He worked on the car for about 90 minutes, and then went back to the house for a screwdriver. *Ibid*. As he walked up the stairs, Johnson came out. *Ibid*. They talked for five to ten minutes, and then Charea joined them. *Ibid*. After Charea left, he and Johnson chatted for another five or ten minutes, and then Johnson left and Davie resumed working on the car. *Ibid*. Davie did not see Johnson near 90th and Marshfield, nor did he see Johnson leave the house during the time he was working on the car.

4

*Id*. at 6-7.  When the police came to arrest Johnson, Davie did not tell them that they had the wrong man, explaining at trial that the police "won't listen."  *Id*. at 7.

The jury found Johnson and Young guilty of first-degree murder, finding that Young fired the shot(s) that killed Roberts and that Johnson was accountable for Young's actions.  *Id*. at 7 & n.1.  The trial court sentenced Johnson to 21 years in prison.  *Id*. at 7.

### B.    Direct Appeal

Johnson appealed, raising five arguments.  Doc. 79-2.  First, he claimed that the prosecution failed to prove his guilt beyond a reasonable doubt.  *Id*. at 15-21.  Second, he claimed that the trial court denied him due process by reversing the order that had severed his trial from Young's.  *Id*. at 21-25.  Third, he claimed that he was denied due process because the prosecutor engaged in misconduct by: (a) asking Mark leading questions on direct examination; (b) introducing hearsay evidence that Young's middle initial was "D"; (c) introducing evidence of Young's arrest record; and (d) making improper comments during closing argument, including that Johnson spoke to police days after the shooting ("Otis … told that to the police two days after this happened") when the prosecutor apparently meant to refer to Mark, that defense counsel cross-examined Mark "ad nauseum" and "relentlessly" and "assassinated" his character, that "senseless violence occurs in our city on a daily basis," and that Mark testified truthfully.  *Id*. at 25-38.  Fourth, Johnson claimed that his trial counsel was ineffective for: (a) failing to object or to seek a limiting instruction when Young's counsel elicited evidence that Mark identified Johnson to Kenneth before speaking with the police, and failing to object when Kenneth testified to Mark's statement; (b) failing to object to the prosecutor's leading questions to Mark and Officer _____ Howley (who had been called to impeach Johnson); (c) failing to object to the prosecutor's improper statements during closing argument; (d) failing to emphasize in closing argument the discrepancy between Jackson's and Mark's respective testimony

regarding the color of Johnson's hoody ("gray" versus "black"), and failing to ask the trial court to give Illinois Criminal Pattern Jury Instruction 3.05; (e) failing to preserve in his motion for a new trial components (a), (b), and (d) of his prosecutorial misconduct claim; and (f) being cumulatively ineffective for all those reasons. *Id*. at 38-45. Fifth, Johnson claimed that the cumulative effect of all the asserted errors denied him due process. *Id*. at 45-47.

The Appellate Court of Illinois rejected Johnson's challenges to his conviction and affirmed. Doc. 79-1 at 7-15. Moreover, at the State's request, the appellate court remanded for resentencing because the trial court had failed to impose a mandatory 15-year enhancement under 730 ILCS 5/5-8-1(a)(1)(d)(i) for first-degree murder offenses committed while the defendant was "armed with a firearm." *Id*. at 15-16.

Johnson filed with the Supreme Court of Illinois a counseled petition for leave to appeal ("PLA"). Doc. 79-6. Johnson reasserted his first three claims in full, *id*. at 5-13, 16-18, and the fourth claim in large part, *id*. at 13-16. As to component (c) of his fourth claim (ineffective assistance), Johnson limited his argument to trial counsel's failure to object to the prosecutor's remarks during closing argument that Mark was cross-examined "relentlessly" and that his character was "assassinated." *Id*. at 14-15. Johnson further argued that the cumulative effect of the errors pressed in his PLA denied him due process, *id*. at 18-19, and that the appellate court denied him the right to an appeal by not addressing several of his claims, *id*. at 19-21.

The state supreme court denied the PLA. *People v. Johnson*, No. 108908 (Ill. Nov. 25, 2009) (reproduced at Doc. 79-7 at 47). On June 18, 2010, on remand, the trial court sentenced Johnson to 35 years in prison, which accounted for the 15-year enhancement that the appellate court had ordered it to impose. Doc. 79-48 at 118. Johnson did not file a direct appeal from the new judgment. Doc. 79-51 at 15.

### C.       Post-Conviction Proceedings

On July 30, 2008, while his direct appeal was pending, Johnson filed a *pro se* petition for relief from judgment under 735 ILCS 5/2-1401, claiming that Kenneth had perjured himself at trial.  Doc. 79-48 at 16-22.  In support, Johnson attached affidavits from Kenneth and Davie, both of whom averred that Kenneth went to Davie's home to tell him that detectives "scared and threatened" Mark into signing a statement that falsely incriminated Johnson.  *Id*. at 18-20. Kenneth's affidavit is described in further detail below.  The trial court recharacterized Johnson's filing as a petition for post-conviction relief under the Post-Conviction Hearing Act, 725 ILCS 5/122-1 *et seq.*, and appointed counsel.  2014 IL App (1st) 130877-U, at ¶¶ 1-2.

Johnson's counsel filed a supplemental post-conviction petition, asserting five additional claims: (1) the trial court denied Johnson due process by permitting Kenneth to "improperly bolster" Mark's testimony by testifying that Mark told him two days after the shooting that Mark gave Johnson and someone else a ride and heard gunshots when they left his car, Doc. 79-48 at 127-131; (2) the State failed to prove Johnson's guilt beyond a reasonable doubt, *id*. at 131-134; (3) the 15-year enhancement under 730 ILCS 5/5-8-1(a)(1)(d)(i) violated due process because the Illinois legislature did not intend it to apply to defendants convicted under an accountability theory, Johnson was not charged with possession of a firearm, and the jury was not instructed on the definition of "armed with a firearm," *id*. at 134-140; (4) Johnson was denied due process by grand jury testimony that he and Young together were armed with a firearm, when only Young physically possessed the firearm, *id*. at 140-143; and (5) Johnson's trial counsel was ineffective for failing to impeach Jackson with a police report indicating that she had told police that the driver of the getaway car was the person wearing a "gray hoody" who yelled, "come on D," in the gangway, *id*. at 143-146.  After expressing "skeptic[ism]" about the credibility of Kenneth's

affidavit, the trial court dismissed the petition. Doc. 79-12 at 9; *see* 2014 IL App (1st) 130877-U, at ¶ 2; Doc. 88 at 3.

Johnson appealed, filing a counseled brief that argued only that his mittimus should be corrected to properly reflect the amount of presentence custody credit he had earned. Doc. 79-21 at 12-15. Johnson attempted to file a *pro se* supplemental appellate brief reasserting the five claims that had been presented in his supplemental post-conviction petition, Doc. 79-13 at 7-22, 29-38, and adding three other claims: (1) he was denied due process by the prosecutor's introduction of Mark's and Kenneth's false testimony, *id*. at 23-24; (2) his post-conviction counsel was ineffective, *id*. at 25-28; and (3) the trial court denied him due process by recharacterizing his petition for relief from judgment as a post-conviction petition without admonishing him as required by Illinois law, *id*. at 39-40.

The appellate court struck Johnson's *pro se* brief, ordered that the mittimus be corrected, and affirmed the judgment dismissing the petition. 2014 IL App (1st) 130877-U, at ¶ 5; *People v. Johnson*, No. 1-13-0877 (Ill. App. Dec. 3, 2014) (reproduced at Doc. 79-24). Johnson filed a *pro se* petition for rehearing complaining that the appellate court did not address the claims presented in his *pro se* supplemental brief. Doc. 79-23. The appellate court denied the rehearing petition, reasoning that it "relate[d] to issues only presented in [Johnson's] *pro se* supplemental brief," which the court had "struck," and that its decision affirming the dismissal of the post-conviction petition "did not address any new issues raised in the *pro se* supplemental brief" because, under Illinois law, "[a] criminal defendant has no right to file additional pleadings when he is already represented by counsel." Doc. 79-24.

Johnson then filed, and the Supreme Court of Illinois denied, a *pro se* PLA raising the eight claims that he had attempted to raise in his *pro se* supplemental post-conviction appellate

brief.  Doc. 79-25; *People v. Johnson*, No. 118790 (Ill. Mar. 25, 2015) (reproduced at Doc. 79-26).

### D.     Successive Post-Conviction Proceedings

On August 21, 2015, Johnson filed a second *pro se* post-conviction petition, claiming that the 15-year firearm sentencing enhancement violated due process and the Second and Eighth Amendments.  Doc. 79-51 at 38-42.  The trial court dismissed the petition.  *Id*. at 50.  Johnson filed a notice of appeal, and the appellate court appointed counsel to assist him.  Doc. 79-28 at ¶ 3.  Johnson's appointed counsel then moved to withdraw on the ground that the appeal was meritless.  *Id*. at ¶ 4.  In response, Johnson renewed the claims raised in his successive post-conviction petition.  Doc. 79-29.  The appellate court granted counsel leave to withdraw and affirmed the trial court's dismissal.  *People v. Johnson*, No. 1-15-3135 (Ill. App. Jan. 16, 2018) (reproduced at Doc. 79-27).  The state supreme court denied Johnson's PLA, Doc. 79-30, which raised the same claims.  *People v. Johnson*, 98 N.E.3d 61 (Table) (Ill. 2018).

On February 2, 2016, Johnson sought leave to file a *pro se*, second successive post-conviction petition, which argued that under *People v. Castleberry*, 43 N.E.3d 932 (Ill. 2015), the appellate court on direct appeal lacked jurisdiction to find that the trial court's failure to impose the 15-year sentencing enhancement rendered his sentence void under Illinois law.  Doc. 79-53 at 24-33.  The trial court denied the petition.  *Id*. at 37.  On appeal, Johnson, assisted by counsel, argued that he should have been permitted to file his second successive petition because he had demonstrated cause and prejudice and because it raised the meritorious argument that state appellate court's remand for resentencing denied him due process under the Illinois Constitution.  Doc. 79-33.  The appellate court affirmed.  *People v. Johnson*, 2019 IL App (1st) 160913-U (Ill. App. Mar. 29, 2019) (reproduced at Doc. 79-32).  The state supreme court denied Johnson's counseled PLA, Doc. 79-38, which argued that *Castleberry* applies retroactively to

cases pending on collateral review. *People v. Johnson*, No. 124916 (Ill. 2019) (reproduced at Doc. 79-39).

## Discussion

Johnson seeks habeas relief on ten grounds. Doc. 56. He numbers his claims one through four and then six through eleven, skipping five; for ease of reference, the court will refer to the claims as Johnson has numbered them. The claims are as follows.

1. Trial counsel was ineffective for:

   a) failing to object or offer limiting instructions when Young's counsel elicited evidence that Mark identified Johnson to Kenneth before speaking with police, and failing to object when Kenneth testified to that statement, *id*. at 3-4;

   b) failing to object to the prosecutor's leading questions to Mark and Officer Howley, *id*. at 4;

   c) failing to object to the prosecutor's statements during closing arguments that (i) Johnson spoke to police two days after the shooting ("Otis … told that to the police two days after this happened"), (ii) Mark was cross-examined "ad nauseum," (iii) "senseless violence occurs in our city on a daily basis," (iv) Mark was cross-examined "relentlessly" and his character was "assassinated," (v) Mark testified truthfully, and (vi) Johnson was the assailant in a "dark" hoody, when in fact Jackson testified that she saw a man in a "gray" hoody and Mark testified that Johnson wore a "black" hoody, *id*. at 4-7;

   d) failing to (i) emphasize in closing argument the discrepancy between Mark's and Jackson's respective testimony regarding the color of Johnson's hoody, (ii) "formally adopt[]" Young's counsel's "much stronger" closing argument, and (iii) request that Illinois Criminal Pattern Jury Instruction 3.05 be given, *id*. at 7;

   e) failing, in his new trial motion, to preserve certain due process arguments, designated below as Claims 8(a), (b), and (d), *id*. at 8;

   f) failing to impeach Jackson with a case report indicating that she told police that the man she saw wearing gray clothing was the driver of the getaway car, not the man running to the car, *id*. at 9-10;

   g) failing to object to hearsay evidence regarding Young's middle initial and failing to take, or not to take, the actions described above, such that counsel was cumulatively ineffective, *id*. at 10.

10

2. Johnson was denied due process because his conviction rested on Mark's and Kenneth's perjured testimony. *Id*. at 10-12.

3. The evidence was insufficient to prove Johnson guilty of murder on an accountability theory. *Id*. at 12-15.

4. Johnson was denied due process when the trial court allowed Kenneth to "improperly bolster" Mark's testimony by testifying that, two days after the shooting, Mark told him that Mark had given Johnson and another man a ride and had heard gunshots when they left his car. *Id*. at 15-16.

6. Johnson was denied due process when the trial court reversed the order severing his trial from Young's without ascertaining whether Johnson's and Young's defenses might be antagonistic to one another. *Id*. at 16-17.

7. Johnson was denied due process because the trial court did not instruct the jury on the definition of "armed with a firearm" under the firearm sentencing enhancement statute, 730 ILCS 5/5-8-1(a)(1)(d)(i). *Id*. at 17-18.

8. Johnson was denied due process when:

    a) the prosecutor asked Mark leading questions on direct examination, *id*. at 18;

    b) the trial court admitted hearsay evidence that Young's middle initial was "D," *id*. at 18-19;

    c) the prosecutor elicited evidence of Young's arrest record, *id*. at 19;

    d) the prosecutor stated during closing argument that defense counsel had "assassinated" Mark's character and commented on the extensiveness of Mark's cross-examination, *id*. at 19-20;

    e) the prosecutor improperly stated during closing argument that Mark testified truthfully, *id*. at 20.

9. Johnson was denied due process by the cumulative effect of the errors alleged in Claims 1 through 8. *Id*. at 20-21.

10. Johnson's 15-year sentencing enhancement violates due process because it is not reasonably designed to prevent gun violence and punishes "innocent conduct," and that the enhancement also violates the Second and Eighth Amendments. *Id*. at 21-23.

11. The appellate court violated due process by ordering the trial court to impose the 15-year sentencing enhancement. *Id*. at 23-24.

I.      **Procedurally Defaulted Claims**

The Warden argues that Johnson procedurally defaulted Claims 1(c)(i)-(iii) & (v)-(vi),

1(d)(ii), 1(e), 1(f), 2, 4, 6, 7, 8, 11, and Claim 9 in part, arguing that (1) the claims were not fairly

presented to the state courts, and/or (2) the state courts rejected the claims on adequate and

independent state law grounds.  Doc. 78 at 16-23.  The court agrees with the Warden, with two

exceptions: first, Johnson fairly presented Claim 1(c)(ii) to the state courts; and second, the court

declines to answer the difficult question whether Johnson procedurally defaulted Claim 8(c)

because that claim fails on the merits in any event.

A.      **Johnson Did Not Fairly Present Claims 1(c)(i), (iii), & (v)-(vi), 1(d)(ii), 1(e), and 11 to the State Courts.**

A federal habeas claim is "procedurally defaulted when a petitioner fails to 'fairly

present' [the] claim to the state courts." *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014).

"To fairly present his federal claim, a petitioner must assert that claim throughout at least one

complete round of state-court review, whether on direct appeal of his conviction or in post-

conviction proceedings." *Ibid.* (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).  That

means that the petitioner, on either direct or post-conviction review, must have "present[ed] the

contention to each level of the state judiciary," *Bland v. Hardy*, 672 F.3d 445, 449 (7th Cir.

2012), by supplying the state court with "both the operative facts and the controlling legal

principles" underlying the claim, *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992)

(internal quotation marks omitted).  Accordingly, "[a] procedural default occurs where a habeas

petitioner has exhausted his state court remedies without properly asserting his federal claim at

each level of state court review." *Crockett v. Hulick*, 542 F.3d 1183, 1192 (7th Cir. 2008)

(internal quotation marks omitted).  For habeas petitioners in Illinois, exhaustion requires

presenting the claim to the Supreme Court of Illinois.  *See Boerckel*, 526 U.S. at 845-46.

Johnson defaulted several components of Claim 1—his ineffective assistance of trial counsel claim—by failing to present the state courts with the operative facts underlying those components of the claim. The bulk of Claim 1(c), which faults trial counsel for not objecting to certain remarks made by the prosecutor in closing argument, is defaulted for that reason. Doc. 78 at 17-18. Specifically, Johnson did not raise the allegations underlying Claim 1(c)(v) and (vi) in either the state appellate court or state supreme court on direct review, Docs. 79-2, 79-6, and although he raised the allegations in Claims 1(c)(i) and (iii) in the appellate court, Doc. 79-2 at 40-41, he did not do so in his PLA, Doc. 79-6. Because a petitioner must "assert in the state courts a *particular* factual basis for [his] claim of ineffective assistance," *Pole v. Randolph*, 570 F.3d 922, 935 (7th Cir. 2009) (emphasis added), Claims 1(c)(i), (iii), and (v)-(vi) are procedurally defaulted. *See Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007) ("[T]he failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to a procedural default.").

The Warden argues that Johnson also defaulted Claim 1(c)(ii)—which asserts that trial counsel should have objected to the prosecutor's statement that Mark was cross-examined "ad nauseum"—by failing to press it before the state supreme court. Doc. 78 at 18. A fair reading of Johnson's PLA suggests otherwise. The PLA faulted trial counsel for not objecting to the prosecution's statements that defense counsel had "assassinated" Mark's character and cross-examined him "relentlessly … for hours," "ask[ing him] over and over again what happened [on the] day" of the murder. Doc. 79-6 at 14-15. Although the PLA did not expressly mention the "ad nauseum" comment, it did so implicitly by highlighting the prosecutor's remarks about the extensiveness and alleged unfairness of Mark's cross-examination. *See Anderson v. Benik*, 471 F.3d 811, 814-15 (7th Cir. 2006) (observing that fair presentment "does not require a

hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same").

Claim 1(d)(ii) (trial counsel's failure to "formally adopt" Young's closing argument) and Claim 1(e) (counsel's failure to preserve several claims of error) are procedurally defaulted. Doc. 78 at 18-19. The reason is that, on direct review, Johnson pressed those components of his ineffective assistance claim before the appellate court, Doc. 79-2 at 42-44, but not in his PLA, Doc. 79-6 at 13-16. *See Pole*, 570 F.3d at 935; *Stevens*, 489 F.3d at 894.

Claim 11—that the state appellate court's decision on direct review to remand for imposition of the 15-year firearm enhancement violated Johnson's federal due process rights—is procedurally defaulted because Johnson did not fairly present it in state court as a federal claim. Doc. 78 at 20-21. To fairly present a federal claim, the petitioner not only must supply the state court with the facts and "the controlling legal principles" underlying the claim, *Verdin*, 972 F.2d at 1474, but also must alert the state court to the claim's "federal nature," *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). Four factors govern whether a petitioner alerted the state court to the claim's federal nature: "1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001); *see also Byers v. Basinger*, 610 F.3d 980, 985 (7th Cir. 2010) (same).

Johnson failed to alert the state courts to Claim 11's federal nature. Doc. 78 at 20-21. In his second successive post-conviction petition, Johnson argued only that *People v. Castleberry*, 43 N.E.3d 932 (Ill. 2015), which concerns the jurisdiction of Illinois courts to correct sentences

imposed in violation of state law, deprived the appellate court of jurisdiction to hold that the trial court's failure to impose the 15-year firearm sentencing enhancement rendered his sentence void. Doc. 79-53 at 24-33. In so arguing, Johnson did not refer to the federal constitution, cite state cases applying a federal constitutional analysis, or even use the phrase "due process." *Ibid*. Granted, Johnson's appellate court brief gestured toward a possible federal due process argument by invoking federal case law on vindictive sentencing claims, Doc. 79-33 at 9, which are within the mainstream of constitutional litigation. *See Williford v. Christianson*, 2016 WL 4798934, at *9 (N.D. Ill. Sept. 14, 2016) (citing federal appellate decisions holding that the federal constitution prohibits sentencing defendants more harshly in order to punish them for going to trial). Johnson's PLA, however, argued only that *Castleberry*'s state law holding should be given retroactive effect on collateral review. Doc. 79-38 at 7-10. The PLA did not refer to the federal constitution, cited two federal decisions only for retroactivity principles, and used the phrase "due process" only once—in the statement of facts, when it inaccurately characterized Johnson's second successive post-conviction petition as having argued that he was "deprived of due process" by the appellate court's remand for resentencing. *Id*. at 6-10. Therefore, the fact pattern that Johnson presented to the state courts is not well within the mainstream of constitutional federal litigation, and it follows from his explicit reliance on principles of state court jurisdiction that his claim was not framed in terms so particular as to call to mind a specific federal constitutional right.

According to the Warden, Johnson likewise failed to alert the state courts to the federal nature of the due process claims in Claims 8(a)-(c), which, respectively, concern the prosecutor's use of leading questions, the trial court's admission of hearsay evidence of Young's middle initial, and the introduction of testimony that Young had an arrest record. Doc. 78 at 19-20.

That procedural default argument need not be resolved. As shown below, Claim 8(b) and the bulk of Claim 8(a) are procedurally defaulted on adequate and independent state law grounds, and Claim 8(c) and the remaining portion of Claim 8(a) fail on the merits. *See* 28 U.S.C. § 2254(b)(2).

> **B.    The State Courts Rejected Claims 1(f), 2, 4, 6, 7, 8(b), 8(d), and 8(e), and Part of Claim 8(a), on Adequate and Independent State Law Grounds.**

Claims 1(f), 2, 4, and 7 are procedurally defaulted because Johnson raised them on post-conviction appeal only in his *pro se* supplemental brief, which the state appellate court declined to consider because, under Illinois law, "[a] criminal defendant has no right to file additional pleadings when he is already represented by counsel." Doc. 79-24. Claims 6 and 8(b), (d), and (e) are procedurally defaulted because, as the appellate court held, Johnson waived those claims by not pressing them at trial. Doc. 79-1 at 10-13. Johnson also forfeited review of Claim 8(a) with respect to "all but three of the [prosecution's allegedly leading] questions by failing to object at trial." *Id*. at 11.

"When the last state court to issue an opinion on a petitioner's federal claim has resolved that claim on an adequate and independent state ground, federal habeas review of the claim is foreclosed. Typically this occurs when the petitioner failed to comply with a state procedural rule and the state court relied on that procedural default to refrain from reaching the merits of the federal claim." *Miranda v. Leibach*, 394 F.3d 984, 991-92 (7th Cir. 2005) (internal citations omitted). A state reviewing court's determination that a petitioner waived or forfeited a claim is "an adequate and independent state ground for a decision." *Franklin v. Gilmore*, 188 F.3d 877, 886 (7th Cir. 1999); *see also Richardson*, 745 F.3d at 268 (holding that a federal habeas claim is "procedurally defaulted through a petitioner's initial failure to preserve it with an objection, even if the petitioner later does attempt to present it for review"); *Whitehead v. Cowan*, 263 F.3d 708,

726-27 (7th Cir. 2001) ("When [petitioner] raised his … claims on direct appeal, the Illinois Supreme Court determined they were waived because [he] had not objected … during trial or in his post-trial brief, thus foreclosing his claims under Illinois law.  The Illinois Supreme Court's ruling thus constitutes an independent and adequate state ground for its decision, and bars federal review of the issue.") (internal citation omitted).  The same is true for a state court's invocation of Illinois's "rule against hybrid representation" to refuse to consider arguments set forth in a counseled petitioner's *pro se* supplemental brief.  *Clemons v. Pfister*, 845 F.3d 816, 820 (7th Cir. 2017) (holding that "the state appellate court applied its general rule that hybrid representation is disfavored and declined to accept [the petitioner's] pro se brief because he was represented by counsel," which "was an independent and adequate state ground of decision [that] precludes federal habeas review of [the petitioner's] claim").

Under these settled principles, the forfeiture and hybrid representation rules upon which the state appellate court relied are independent and adequate state law grounds that bar review of Claims 1(f), 2, 4, 6, 7, and 8(b), (d), and (e), as well as the bulk of 8(a).  True enough, the appellate court in the alternative rejected Claims 6 and 8(b) on the merits, Doc. 79-1 at 10-12, and it reviewed Claims 8(d) and (e) under the plain error doctrine, finding no error, *id*. at 12-13.  But a state reviewing court's consideration of a claim for plain error, or rejection of a claim on the merits in the alternative to a forfeiture or waiver holding, does not save that claim from procedural default under the adequate and independent state ground doctrine.  *See Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002) ("[W]hen a state court decides the merits *and* asserts a procedural bar, the federal court must respect both rulings[.]"); *Kaczmarek v. Rednour*, 627 F.3d 586, 592 (7th Cir. 2010) ("We consistently have held that where a state court reviews a federal constitutional claim for plain error because of a state procedural bar … that limited review does

not constitute a decision on the merits. … Therefore, we conclude that the waiver rule also was an adequate state law ground."); *Rodriguez v. McAdory*, 318 F.3d 733, 736 (7th Cir. 2003) ("Although a state court's review of whether an error is plain often entails at least limited review of the merits, that limited review is at most entangled with the merits and certainly not entirely dependent on the merits. Thus the state court's plain error review of [petitioner's] claims did not undo his procedural default.") (internal quotation marks and citations omitted).

\* \* \*

In sum, the following claims are procedurally defaulted: Claim 1(c)(i), (iii), (v), and (vi), Claims 1(d)(ii), 1(e), 1(f), 2, 4, 6, 7, and 11, Claim 8(b), (d), and (e), and most of Claim 8(a). Moreover, Claim 9, which alleges cumulative error, is procedurally defaulted to the extent that it relies on those claims or sub-claims. Doc. 78 at 21.

### C. Johnson Cannot Overcome His Procedural Defaults.

A habeas petitioner may overcome a procedural default by: (1) demonstrating cause and prejudice; or (2) showing that the habeas court's failure to consider the claim would result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010). Johnson satisfies neither ground for overcoming his procedural defaults. Doc. 87 at 5-9.

### 1. Cause and Prejudice

"Cause for a default is ordinarily established by showing that some type of external impediment prevented the petitioner from presenting his claim. Prejudice is established by showing that the violation of the petitioner's federal rights worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Thompkins v. Pfister*, 698 F.3d 976, 987 (7th Cir. 2012) (internal quotation marks and citations omitted).

Because Johnson does not demonstrate cause for his procedural defaults, it is unnecessary to address prejudice.

Johnson suggests two potential causes for his defaults. First, he asserts that he received ineffective assistance of appellate counsel. Doc. 87 at 6. If Johnson's "appellate attorneys were ineffective for failing to present [some of his] claims … on direct appeal of his conviction, then their sub-par representation might supply cause for his procedural default of these claims." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). However, "ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim" that must have been fairly presented to the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Put another way, "the exhaustion doctrine … generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986). Johnson does not satisfy that requirement, for he did not raise a claim of ineffective assistance of appellate counsel on post-conviction review. *See Crutchfield v. Dennison*, 910 F.3d 968, 978 n.4 (7th Cir. 2018) (holding that the petitioner could not establish "cause" to excuse procedural default of his ineffective assistance of trial counsel claim by alleging the ineffectiveness of his appellate counsel in failing to present that claim on direct appeal because he "had an opportunity in his first postconviction petition to raise a claim of ineffective assistance of appellate counsel, but he did not do so").

Second, Johnson argues that the state court process was "inadequate" in that his efforts to raise his federal claims on post-conviction review were "thwarted by the conduct of both his appointed counsel … and the state appellate court." Doc. 87 at 5, 7. However, "[b]ecause there is no Sixth Amendment right to counsel on collateral review, attorney error in post-conviction

proceedings is not cause to excuse a procedural default." *Crutchfield*, 910 F.3d at 973 (citing *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017)). And Johnson cannot benefit from the narrow exception to that rule for ineffective assistance of trial counsel claims recognized in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), because that exception does not apply in Illinois. *See Crutchfield*, 910 F.3d at 972-78. Johnson's complaint about the adequacy of the state appellate court, which is really a complaint about the state court's application of the Illinois rule against hybrid representation, fails as well because he does not demonstrate that the state courts have applied the rule with the "purpose or pattern to evade constitutional guarantees." *Clemons*, 845 F.3d at 820 (quoting *Beard v. Kindler*, 558 U.S. 53, 65 (2009) (Kennedy, J., concurring)); *see also id.* at 820 (rejecting the petitioner's argument that the Illinois rule against hybrid representation was "inadequate" "simply [because] … the application of the rule in his case made it more difficult for him to present his federal claims to the state court for adjudication").

### 2. Fundamental Miscarriage of Justice

"The fundamental miscarriage of justice exception [to procedural default] requires 'the habeas petitioner to show that a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Smith*, 598 F.3d at 387 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)); *see also McCoy v. United States*, 815 F.3d 292, 295 (7th Cir. 2016) ("Absent a showing of both cause and prejudice, procedural default will only be excused if the prisoner can demonstrate that he is 'actually innocent' of the crimes of which he was convicted."). "To pass through the actual-innocence gateway to a merits review of a procedurally barred claim, the petitioner must have new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial,

and must persuade the district court that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016) (internal quotation marks and citations omitted).

The only potentially new evidence referenced by Johnson arrives via his submission, in connection with Claim 2, that his conviction rested on Mark's and Kenneth's perjured testimony. Doc. 56 at 10-12; Doc. 87 at 29; Doc. 88 at 3. In support, Johnson points to affidavits from Mark and Kenneth that, he contends, show that he was not at the scene of the shooting. *Ibid*. Johnson does not reference the affidavit from Davie that he presented in state court.

Kenneth's affidavit, executed on December 29, 2006, avers that he "gave a false testimony at Otis Johnson's trial, and that my brother Mark Harvey never told me he took Otis Johnson and someone else to commit any crime." Doc. 56 at 37. According to the affidavit, Kenneth accompanied Mark when he was taken into custody for questioning and saw the "detectives[] scar[ing] … Mark Harvey into signing a statement against Otis Johnson" by threatening "to charge him with the murder," and Kenneth, at the detectives' urging, agreed to "help Mark out by backing up" his false statement. *Id*. at 36. Kenneth further avers that, after he told Davie what happened at the stationhouse, Davie gave him the number of Johnson's lawyer. *Ibid*. According to Kenneth, Mark then called Johnson's lawyer to say that Mark "had nothing to with the crime, and that he never took Otis Johnson over to kill anyone," and Mark remains "afraid to come forward [to the police] with the truth." *Ibid*.

Mark's affidavit—executed on August 28, 2007, several months after Kenneth's—avers as follows:

> On the day of the so called incident, I, Mark Harvey, was picked up by detectives. The detectives stated to me that they had witnesses saying they saw my car on 89th & Racine at the scene of a murder investigation. The detectives asked me to go down to the police station for questioning. When I

got to the police station the detectives asked me to sign a statement saying that Otis Johnson had committed a crime. They told me not to worry because they will write the statement up so that it will not incriminate me. I was under the influence of a controlled substance and could not think properly so I refused. When I refused, the detectives threaten [sic] to charge me with the crime. So I signed the statement out of fear. Now that I am not under the influence of persuasion and drugs, I would like to testify that the statement I signed was false, and that the above statement is true.

*Id.* at 35.

The two affidavits are of questionable probative value. While it is not clear from the record whether the state courts considered Mark's affidavit—which was not attached to Johnson's *pro se* petition for relief from judgment, Doc. 79-48 at 16-22—the state trial court was rightly "skeptical" of Kenneth's affidavit, Doc. 79-12 at 9. In addition to the general skepticism with which the law treats recantations, *see Olson v. United States*, 989 F.2d 229, 231 (7th Cir. 1993) ("It is a truism that our courts treat recantations with skepticism."), the fact that the averments in Kenneth's affidavit largely implicate not his personal knowledge, but "what his brother knew and didn't know at the time," further reduces the weight jurors would likely have given his testimony, Doc. 79-12 at 9.

There is reason to view Mark's one-paragraph recantation with even greater skepticism. Not only did Mark wait eight months longer than Kenneth to disavow his trial testimony— raising the possibility that Mark's recantation was the product of pressure from his brother and Johnson's family members—the scant factual detail in his affidavit undercuts its reliability. *See McDowell v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (holding that the petitioner's "eleventh hour" affidavit, which "contain[ed] no indicia of reliability," was "insufficient to meet the actual innocence bar"); *Morales v. Johnson,* 659 F.3d 588, 606 (7th Cir. 2011).

The veracity of Mark's and Kenneth's affidavits is further discredited by the testimony of other trial witnesses. The state appellate court found that two witnesses besides Kenneth

22

corroborated Mark's testimony that he dropped off Johnson and another man in the alley between Elizabeth Street and Racine Avenue and heard gunshots from the alley while the pair were there.  Doc. 79-1 at 8-9; *see Coleman v. Lemke*, 739 F.3d 342, 351 (7th Cir. 2014) (in assessing an actual innocence gateway argument, deferring under § 2254(e)(1) to the state post-conviction trial court's factual findings concerning a witness's credibility).  Specifically, the appellate court determined that Mark's testimony was "corroborated by David Walker, who heard five to seven gunshots, and saw that the shooter was wearing a gold hoody with the hood pulled over his head."  Doc. 79-1 at 8.  The court added that Mark's testimony was "further corroborated by Jackson, who testified that she heard multiple gunshots [in the alley]," that she "saw someone with a gray hoody walk through her neighbor's gangway" who called out, "Come on, D"—which Detective Lazzara testified was Young's middle initial—and that she "heard a very loud muffler" and saw what she thought was a "gray car" departing the scene.  *Id*. at 8-9.  When considered together with Kenneth's uncontroverted testimony that Mark drove a grey car that "needed a new muffler," the Walker's and Jackson's testimony would lead a reasonable jury to find that Mark truthfully testified at trial that he drove Johnson (wearing a "black" hoody) and another man (wearing a "brownish-gold" hoody) to the scene of the murder.  *Id*. at 2, 9.  Their testimony also undermines the veracity of Mark's and Kenneth's recantation affidavits.

In short, Johnson does not offer the kind of "reliable evidence"—"exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," *Schlup*, 513 U.S. at 324, or "documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs," *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005)—that generally is necessary for a habeas petitioner to pass through the actual innocence gateway.  And because Mark's and Kenneth's affidavits do

not provide the type of decisive evidence sufficient to show on federal habeas review that it is "more likely than not that *no* reasonable juror would have convicted" Johnson, he does not satisfy the actual innocence requirement.  *Jones*, 842 F.3d at 461 (internal quotation marks and citations omitted) (emphasis added); *see also Blackmon v. Williams*, 823 F.3d 1088, 1101-02 (7th Cir. 2016) (holding that testimony from two new witnesses that the petitioner was not the shooter was "not enough to meet the demanding *Schlup* standard for actual innocence," even though "no physical evidence tied him to the murder, and the State introduced no evidence of a motive," where two other eyewitnesses had testified that he was the shooter); *Gladney v. Pollard*, 799 F.3d 889, 899 (7th Cir. 2015) (holding that new evidence permitting a "possible inference but by no means a required [inference]" of the petitioner's innocence was insufficient to meet his "heavy burden" of showing that "it is likely that *no* reasonable juror would have convicted").

## II.    Claims Considered on the Merits

### A.    Ineffective Assistance of Trial Counsel (Claim 1)

Johnson has preserved for federal habeas review components (a), (b), (c), (d), and (g) of Claim 1, either in full or in part.  The parties dispute whether the court should review the non-defaulted components of Claim 1 *de novo* or under the deferential standard of review in 28 U.S.C. § 2254(d).  Doc. 78 at 24-35; Doc. 87 at 9-28.  The court need not resolve that dispute because those components of Johnson's ineffective assistance claim fail even under *de novo* review.

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel.  *See Vinyard v. United States*, 804 F.3d 1218, 1224 (7th Cir. 2015) (citing *Strickland v. Washington*, 466 U.S. 668, 684-86 (1984)).  A defendant claiming ineffective assistance must show that (1) his attorney's performance was deficient and (2) he suffered prejudice as a result.

24

*See Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015). As to deficient performance, a defendant must show that counsel's performance "'fell below an objective standard of reasonableness.'" *Blackmon*, 823 F.3d at 1102-03 (quoting *Strickland*, 466 U.S. at 688). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (internal quotation marks omitted). "A court's scrutiny of an attorney's performance is 'highly deferential' to eliminate as much as possible the distorting effects of hindsight, and [it] 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Vinyard*, 804 F.3d at 1225 (quoting *Strickland*, 466 U.S. at 689); *see also Woods v. Etherton*, 578 U.S. 113, 136 S. Ct. 1149, 1151 (2016) ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.") (internal quotation marks omitted). As to prejudice, a defendant must show "a reasonable probability that, but for counsel's [allegedly] unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Hinesley v. Knight*, 837 F.3d 721, 732 (7th Cir. 2016) (holding that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome") (internal quotation marks omitted).

### 1.    Claim 1(a)

Johnson challenges his trial counsel's decision not to object or request a limiting instruction when Young's counsel elicited hearsay testimony from Mark that, days before the police apprehended him, he had told Kenneth about his connection to the shooting. Doc. 56 at 3-4. Counsel's failure to object, Johnson asserts, placed before the jury a "damaging prior consistent statement" that "bolstered Mark's credibility." Doc. 87 at 11. Johnson likewise

challenges counsel's failure to object when the prosecutor later elicited Kenneth's testimony that Mark made that statement to him. Doc. 56 at 3-4. Counsel's performance was not deficient because declining to object to Mark's testimony or to request a limiting instruction was a permissible strategic choice, and because there was no valid basis to object to Kenneth's testimony. Doc. 78 at 26-28, 38-40.

"*Strickland* generally provides a presumption of strategic decision-making by counsel" unless "there was no strategic rationale underlying the errors." *Mitchell v. Enloe*, 817 F.3d 532, 538-39 (7th Cir. 2016) (alterations and internal quotation marks omitted). Johnson does not overcome that presumption as to Mark's testimony, given that his counsel could have declined to object or to ask for a limiting instruction in order to avoid focusing the jury's attention on that testimony. As Johnson acknowledges, Mark's testimony that he had told Kenneth about the shooting before learning that he (Mark) was a suspect undermined Johnson's theory that Mark fabricated Johnson's involvement in the murder in response to police pressure. Accordingly, it was a permissible strategic choice for counsel not to highlight that damaging testimony by objecting to it or requesting a limiting instruction. Doc. 78 at 27; *see Hardamon v. United States*, 319 F.3d 943, 949 (7th Cir. 2003) ("A competent trial strategy frequently is to mitigate damaging evidence by allowing it to come in without drawing additional attention to it, such as an objection would."); *United States v. Payne*, 741 F.2d 887, 891 (7th Cir. 1984) ("A competent trial attorney might well eschew objecting … in order to minimize jury attention to the damaging material."). True enough, counsel could have attracted *less* attention to Mark's testimony by making his objection during a sidebar, Doc. 87 at 14, but counsel reasonably could have thought it preferable to avoid drawing *any* attention to the testimony, and thus to refrain from interrupting the flow of questioning through a sidebar request immediately after the testimony.

Second, counsel did not render ineffective assistance by failing to object to Kenneth's testimony because that testimony was admissible under Illinois law. *See Carter*, 796 F.3d at 735 (holding that "failing to make a futile objection" is not deficient performance); *Lambert v. McBride*, 365 F.3d 557, 563-64 (7th Cir. 2004) (same, where the state court "would have overruled" the proposed objection); *United States v. Neeley*, 189 F.3d 670, 684 (7th Cir. 1999) (same, where counsel did not object to "evidence that was properly admitted"). In Illinois, "prior consistent statements are properly admitted to rebut a charge that the witness is motivated to testify falsely" or "to rebut a charge that testimony is of recent fabrication." *People v. Mullen*, 730 N.E.2d 545, 555 (Ill. App. 2000). "The party seeking to introduce the prior consistent statement has the burden of establishing that the statement predates the alleged recent fabrication or predates the existence of the motive to testify falsely." *Id*. at 555-56. Citing these principles, the Warden correctly contends that Kenneth's testimony was properly admitted to rebut the implication—raised by both defendants during Mark's cross-examination, Doc. 79-41 at 176-179, 230-233—that Mark had fabricated his story implicating Johnson when taken into police custody for questioning on May 28, 2003. Doc. 78 at 27, 38-40.

Although Johnson does not dispute that he and Young opened the door to Kenneth's corroborative testimony, he retorts that Mark's prior consistent statement was nonetheless inadmissible because Mark made the statement after Kenneth told him that the police were looking at his car, *i.e.*—"at a time when he already knew he was under suspicion." Doc. 87 at 14-15. That is questionable as a factual matter. Mark testified that he did *not* know that the police were "looking to talk to [him]," and thus that he was a suspect, until the police unexpectedly "picked [him] up." Doc. 79-41 at 181. And regardless, the "charge" the defendants levied against Mark was that he fabricated his story upon being taken into custody,

and his statement to Kenneth preceded his custody. *Id*. at 176-179, 230-233; *cf. People v. Terry*, 728 N.E.2d 669, 678-79 (Ill. App. 2000) (holding that a witness's prior consistent statements were inadmissible because they were not made until after he had been "question[ed] at the police station over a two-day period, which may have meant that he was a suspect," and therefore after he had obtained the motive to testify falsely).

Thus, Claim 1(a) fails on the merits because Johnson does not show that his counsel's performance fell below an objective standard of reasonableness.

### 2. Claim 1(b)

Johnson next argues that trial counsel was ineffective for failing to object to the leading questions that the prosecutor posed on direct examination to Officer Howley (who was called to impeach Johnson) and to Mark. Doc. 56 at 4. This argument fails. Objecting to many of the leading questions would have been futile because the trial court had already overruled Young's counsel's objections to the same or materially indistinguishable questions. Doc. 79-41 at 162, 167; *see Carter*, 796 F.3d at 735; *Lambert*, 365 F.3d at 563-64. Moreover, even if counsel acted unreasonably in failing to object, Johnson suffered no prejudice. Given the relative unimportance of the testimony elicited via leading questions, Doc. 87 at 57-58, and the fact that "the prosecutor could have rephrased [each] question to make it a nonleading question" if Johnson's counsel had successfully objected, there is no reasonable likelihood that Johnson would have been acquitted had counsel objected. *People v. Guest*, 655 N.E.2d 873, 884 (Ill. 1995) (rejecting the defendant's argument that trial counsel was ineffective for failing to object to the prosecution's leading question, reasoning that "th[e] question was not critical to the trial and did not add anything substantial to the record" and that the prosecutor could have re-phrased the question if necessary).

### 3. Claim 1(c)(ii), (iv)

Johnson next challenges trial counsel's failure to object to the prosecutor's statements in closing argument that Mark had been cross-examined "ad nauseum" and "relentlessly" and that defense counsel had "assassinated" his character. Doc. 56 at 5. Those challenges have no merit. Counsel reasonably declined to object to the "ad nauseum" comment because the trial court had already overruled Young's counsel's objection to the same comment, so an additional objection would have been futile. Doc. 79-43 at 126. Counsel also reasonably declined to object to the prosecution's other comments about defense counsels' attack on Mark's credibility because, as shown below, those comments were proper and counsel's failure to object therefore was neither deficient nor prejudicial. Doc. 78 at 29-30, 47-50.

As the trial court explained when denying Young's motion for a new trial, the prosecutor's closing remarks were "fair" given that Mark "was examined in an aggressive confrontational style" with "no limitations put on the amount of questions the defense asked or the style in which they were asked which could be described as confrontational, sarcastic[,] and aggressive." Doc. 79-43 at 174-175; *see* Doc. 79-41 at 173-222 (Young's cross-examination of Mark), 223-233 (Johnson's cross-examination of Mark). The prosecutor's remarks were also permissible because they directly responded to the attacks on Mark's character and credibility that both defense counsel made during their closings. Young's counsel repeatedly called Mark a "dope fiend" and a "liar," suggested that he had testified while under the influence of drugs, and claimed that he was not trustworthy enough to "baby sit [jurors'] children," "house sit," or "take the day's receipts … to make a cash deposit at the bank." Doc. 79-43 at 87, 91-95, 110. Johnson's counsel levied similar charges against Mark's character. *Id.* at 119-120 (arguing that

Mark was "a liar" who was "lying to protect himself," and that "[h]e's a liar, he's a pariah" who "was high when he was testifying").

Given all this, the prosecution properly responded to the attacks on Mark's character by stressing that his testimony remained consistent while defense counsel cross-examined him "relentlessly" and "assassinated" his character. *Id*. at 125-142; *see United States v. Nunez*, 532 F.3d 645, 653-54 (7th Cir. 2008) (holding that the prosecutor's statement that "defense counsel's closing argument was 'nothing more than a not so thin, veiled, disguised attack on the integrity of a good DEA special agent'" was not improper because it "was in direct response to defense counsel's attacks on the credibility of [the agent] and was thus proper rebuttal argument"). Accordingly, even if Johnson's counsel had objected to the prosecutor's remarks, there is no reasonable likelihood that the trial court would have sustained those objections, let alone that the jury would have acquitted Johnson had the court done so.

### 4.    Claim 1(d)(i), (iii)

Johnson argues that trial counsel was ineffective for: (1) failing to propose Illinois Criminal Pattern Jury Instruction 3.05, which would have "reminded [the jury] that evidence against [Young] should not be used against [Johnson]," and (2) failing to emphasize in closing arguments that Mark testified that Johnson was wearing a "black" hoody, while Jackson testified that she saw a man wearing a "gray" hoody. Doc. 56 at 7-8. Neither argument has merit.

In a trial with more than one defendant, a party may ask the trial court to give Illinois Criminal Pattern Jury Instruction 3.05, which states:

> You should give separate consideration to each defendant. Each is entitled to have his case decided on the evidence and the law which applies to him.
>
> [Any evidence which was limited to [(one defendant) (some defendants)] should not be considered by you as to [(any) (the)] other defendant[s].]

The committee note states that the trial court is to "[g]ive the second paragraph [of the instruction] when appropriate." *Ibid*.

Johnson's counsel did not perform unreasonably by not requesting Instruction 3.05 because Young's counsel sought, and the trial court agreed to give, the instruction. As the state appellate court recognized, the record confirms that the trial court gave the first paragraph of Instruction 3.05. Doc. 79-1 at 14-15. Acknowledging this fact, Johnson shifts his focus from the instruction's first paragraph to its second, stressing that including the second paragraph would have enabled him to identify *particular* statements that he did not want the jury to consider against him. Doc. 87 at 21. Specifically, Johnson states that his counsel could have identified "the prior consistent statement elicited by Young's counsel, Kenneth's testimony, testimony about 'Come on, D', the 'gold hoodie' jacket, and about Young's middle initial being 'D', [because that] was all evidence against Young and not [Johnson], and should not have been considered against [Johnson]." *Id*. at 21-22.

As to the prior consistent statement elicited by Young's counsel—Mark's testimony that he had identified Johnson to Kenneth before speaking with the police, *id*. at 11-12—Johnson has not overcome the presumption that his counsel's failure to request a limiting instruction was a permissible strategic choice. As discussed as to Claim 1(a), counsel reasonably could have thought it best to avoid drawing the jury's attention to Mark's prior consistent statement by seeking a limiting instruction as to that statement. *See Hardamon*, 319 F.3d at 949; *Payne*, 741 F.2d at 891.

As for the other evidence cited by Johnson, counsel's performance was not deficient because the evidence was admissible against him. *See United States v. Giangrosso*, 779 F.2d 376, 381 (7th Cir. 1985) (holding that the defendant "was not denied effective assistance of

counsel when her attorney failed to request a limited instruction since the evidence was admissible against [the defendant]"). As discussed as to Claim 1(a), Kenneth's corroborative testimony that Mark had mentioned Johnson's connection to the shooting before speaking to the police, Doc. 87 at 12-13, was properly admitted against Johnson to rebut the implication that Mark had fabricated Johnson's involvement in the murder upon being taken into police custody. Likewise, as discussed below as to Claim 1(g), Detective Lazzara's testimony about Young's middle initial was admissible against Johnson to identify Johnson as the assailant who, as Jackson testified, called out, "[c]ome on, D." Doc. 79-1 at 4.

Johnson contends that Jackson's "[c]ome on, D" testimony, *ibid.*, as well as testimony by Mark and Walker that Young was wearing a gold hoody, *id.* at 2, 4, was inadmissible against him because it was "evidence against Young and not [Johnson], and should not have been considered against [Johnson]," Doc. 87 at 21-22. That contention is unpersuasive. Jackson's "[c]ome on, D" testimony places another person in the alley with Young right after the shooting, thereby corroborating Mark's testimony that Johnson entered and exited the alley with Young and linking Johnson to the shooting, Doc. 79-1 at 3, 8-9. Similarly, Walker's testimony that the shooter was wearing a "gold pullover sweater with the hood pulled over his head," *id.* at 4, identifies Johnson's fellow passenger in Mark's car as the shooter, again linking Johnson to the shooting, *id.* at 2-3, 8. Johnson's ineffectiveness claim based on his counsel's failure to request the second paragraph of Instruction 3.05 as to that evidence therefore fails.

The same holds for Johnson's contention that his counsel delivered a weak closing argument by failing to emphasize the discrepancy between Mark's and Jackson's testimony as to the color of hoody that he was wearing. True enough, counsel could have argued, as Johnson now suggests, that the divergent testimony on this point tended to show that Mark's testimony

was a lie, in that Mark testified that Johnson was wearing a "black" hoody while Jackson testified that the assailant was wearing a "gray" hoody. Doc. 87 at 21. It does not follow, however, that there was "no strategic rationale" underlying counsel's decision not to emphasize that discrepancy. *Mitchell*, 817 F.3d at 539. To the contrary, counsel reasonably declined to belabor the relatively minor difference between Mark's and Jackson's descriptions of Johnson's hoody in order to focus his closing argument on other, more fruitful reasons to discredit Mark's testimony and to credit Johnson's. Doc. 78 at 31. Because it was undisputed that the person in the *gold* hoody shot the victim, the central question at trial from Johnson's perspective was whether he was the individual with that person and thus accountable for that person's actions. The contest between Mark's and Johnson's credibility—with Mark testifying that, on the day of the shooting, he picked up Johnson and another man at the corner of 90th and Marshfield, drove them to the alley where the shooting occurred, saw them enter the alley, heard gunshots coming from the alley, and then saw them exit the alley, Doc. 79-1 at 2-3, and Johnson testifying that he had not been near the corner of 90th and Marshfield that day, had not paid Mark to drive him anywhere, and had had nothing to do with the shooting, *id*. at 6—was key to resolving that question. Counsel therefore made the permissible strategic choice to focus his closing on assailing Mark's credibility as compared to Johnson's, and not on teasing out a possible inconsistency between Mark's and Jackson's descriptions of Johnson's hoody, especially where Jackson had testified that she saw the hoody only briefly when the person wearing it ran past the garage floor where she was lying. Doc. 79-42 at 27-28, 33.

### 5. Claim 1(g)

Johnson asserts that trial counsel was cumulatively ineffective for taking, or failing to take, the actions identified in Claims 1(a)-(f), and also for failing to object to Detective Lazzara's

testimony about Young's middle initial, which the prosecutor used to support the view that the shooter was Young and that the assailant whom Jackson heard call out, "come on D," was Johnson.  Doc. 56 at 9-10; Doc. 87 at 25, 27-28.  In assessing this claim, the court begins by noting that the components of Johnson's ineffective assistance claim already discussed on the merits do not rise to the level of deficient performance, either alone or in the aggregate.  With that in mind, and setting aside the procedurally defaulted components of the claim, Johnson is left with only his charge that counsel was ineffective for failing to object to Lazzara's testimony about Young's middle initial.

The pertinent exchange occurred when the prosecutor asked Lazzara whether, "in conducting the photo array of Alonzo Young and in actually processing Alonzo Young," he had learned Young's middle initial, to which Lazzara responded that Young's middle initial was "D." Doc. 79-42 at 137-138.  Johnson submits that this testimony was inadmissible hearsay under Illinois law, and therefore that his counsel was ineffective in failing to object on that ground. Doc. 87 at 27-28, 60-62.

The argument fails for two reasons.  First, the trial court overruled Young's counsel's hearsay objection to the same testimony, Doc. 79-42 at 138, such that another objection from Johnson's counsel would have been futile.  *See Carter*, 796 F.3d at 735; *Lambert*, 365 F.3d at 563-64.  Second, the testimony was properly admitted in any event.  *See Neeley*, 189 F.3d at 684 ("Obviously, counsel can not [sic] be considered ineffective for failing to make an objection to the introduction of evidence that was properly admitted.").  As the state appellate court recognized when addressing Young's same claim on direct appeal, his middle initial was admissible because "Lazarra [sic] testified that he became aware of [Young's] middle initial while conducting a photo array and while processing him," and "[t]he processing of criminal

suspects involves the suspect's provision of basic information such as his or her name."
Doc. 79-54 at 9-10; *see People v. Keller*, 470 N.E.2d 1200, 1203-04 (Ill. App. 1984) ("[M]uch latitude is given in the admission of testimony to establish the identity of a person or a person's name for identity can usually be established only through some form of hearsay.").

### B. Sufficiency of the Evidence (Claim 3)

Johnson claims that the evidence was insufficient to prove beyond a reasonable doubt his guilt of first-degree murder. Doc. 56 at 12-15. Because the state appellate court adjudicated that claim on the merits, Doc. 79-1 at 7-9, it is subject to review under 28 U.S.C. § 2254(d).

"Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of th[e] [Supreme] Court, § 2254(d)(1); or that it 'involved an unreasonable application of' such law, § 2254(d)(1); or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (citation omitted); *see also Gilbert v. McCulloch*, 776 F.3d 487, 491-92 (7th Cir. 2015). Johnson invokes each ground in challenging the state appellate court's adjudication of his insufficient evidence claim. Doc. 87 at 34-45.

As to § 2254(d)(1), a state court's decision is "contrary to" clearly established federal law if the court "applies the wrong legal standard established by Supreme Court precedent or decides a case differently than the Supreme Court on materially indistinguishable facts." *Kamlager v. Pollard*, 715 F.3d 1010, 1015 (7th Cir. 2013) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). The "lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since 'a general standard' from [the Supreme Court's] cases can supply such law." *Gilbert*, 776 F.3d at 491 (alteration in original) (quoting *Marshall v. Rodgers*, 569 U.S. 58, 62 (2013)). Still, the "contrary to" standard is "difficult to meet," as

"clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of th[e] [Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks omitted).

"Alternatively, a state court decision involves an 'unreasonable application of' federal law [under § 2254(d)(1)] if the state court 'correctly identifies the governing legal principle … but unreasonably applies it to the facts of the particular case.'" *Kamlager*, 715 F.3d at 1015-16 (ellipsis in original) (citing *Bell*, 535 U.S. at 694). To obtain relief under the "unreasonable application" prong of § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Wheeler*, 577 U.S. 73, 77 (2015) (internal quotation marks omitted). "[A] federal habeas court may overturn a state court's application of federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme] Court's precedents." *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (internal quotation marks omitted).

Far from "appl[ying] a rule different from the governing law set forth in [Supreme Court] cases," *Bell*, 535 U.S. at 694, the state appellate court correctly identified the rule for an insufficient evidence claim, as articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979). Doc. 79-1 at 7 (citing *People v. Cunningham*, 818 N.E.2d 304, 307 (Ill. 2004), which in turn quoted *Jackson*). The rule provides that an insufficient evidence claim fails if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The state appellate court applied this rule and concluded that the "evidence, viewed in the light most

favorable to the prosecution, supports [Johnson's] conviction beyond a reasonable doubt." Doc. 79-1 at 9.

That evidence, as the appellate court described it, included Mark's testimony that while giving Johnson a ride, Johnson saw someone he knew, directed Mark to pick up Young (who was wearing a brownish-gold hoody), and ordered Mark to return to the spot where he had seen that person. *Id*. at 8. Mark further testified that Johnson, after spotting a particular car in an alley, exclaimed, "there go the mother fuckin' car right there." *Ibid*. Johnson and Young then walked into the alley, Mark heard gunshots from the alley, and when the pair returned to Mark's car, Mark overheard Johnson tell Young, "you laid them down," and saw Johnson shake Young's hand. *Ibid*. The evidence also included testimony from Kenneth, Walker, and Jackson that, as the appellate court correctly held, "corroborated" Mark's account. *Id*. at 8-9. Based on all this evidence, a rational jury could have found beyond a reasonable doubt that Johnson selected the victim as a target and brought Young into the alley to murder him, and thus conclude that Young committed the murder, and that Johnson was accountable for Young's actions. *See* 720 ILCS 5/5-2(c) (providing that one person is accountable for another person's offense if the first person "solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense"). Accordingly, a "fairminded jurist" could easily agree with the state appellate court's rejection of Johnson's insufficient evidence claim, which means that § 2254(d)(1) precludes this court from disturbing it on habeas review. *See Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (holding that "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference," the first being the state court's deference on direct appeal to the jury's findings, and the second being the federal habeas court's deference to the state court's *Jackson* holding).

Nor were the facts as found by the state court unreasonable under § 2254(d)(2).  A state court decision involves an "unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence."  *Morgan v. Hardy*, 662 F.3d 790, 801 (7th Cir. 2011).  "[A] state court's factual finding is never unreasonable 'merely because the federal habeas court would have reached a different conclusion in the first instance.'  Rather, the state court's determination of the facts must have been an unreasonable error in light of the evidence presented to that court."  *Collins v. Gaetz*, 612 F.3d 574, 586 (7th Cir. 2010) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

Johnson's submission that the state appellate court's determination of the facts was unreasonable rests principally on his assertion that Mark's testimony was incredible and uncorroborated.  Specifically, Johnson contends that there are "real credible doubts" about Mark's testimony, given that he was a heroin addict with prior convictions, did not actually see the shooting, and was under suspicion for the murder when he told police that Johnson was involved.  Doc. 56 at 12-13; Doc. 87 at 36-41.  Johnson further contends that no other witness corroborated Mark's testimony, in that Kenneth's testimony was improper hearsay (it was not), Walker saw only the assailant wearing the "gold" hoody (Young), and Jackson saw an assailant wearing a "gray" hoody while Mark testified that Johnson was wearing a "black" hoody.  Doc. 56 at 13-14; Doc. 87 at 37-38, 41.

The appellate court considered and reasonably rejected those arguments.  As to Mark's credibility, the court stressed that "[i]t is the trier of fact's responsibility to determine the weight given to a witness'[s] testimony and the credibility of the witness, and to resolve any inconsistencies or conflicts in the evidence," adding that "[t]he jury found that Mark … was a credible witness."  Doc. 79-1 at 7-8, 9 (citing *People v. Sutherland*, 860 N.E.2d 178, 217 (Ill.

2006); *see also United States v. Elder*, 840 F.3d 455, 460 (7th Cir. 2016) ("As we have said time and again, however, [i]t is for the jury—not the court of appeals—to judge the credibility of witnesses, and attacks on witness credibility are insufficient to sustain a challenge to the sufficiency of the evidence.") (internal quotation marks omitted). Regarding the discrepancy between Mark's and Jackson's respective descriptions of the color of Johnson's hoody, the appellate court stated: "Discrepancies in the description of the offender are not necessarily fatal, but affect only the weight given to testimony. Moreover, precise accuracy in describing the facial characteristics and clothing of [a] defendant is not necessary where the identification is otherwise positive." Doc. 79-1 at 9 (internal quotation marks and citations omitted). Given the court's rational explanation for rejecting his claim, Johnson has not come close to showing that the court's determination of the facts was unreasonable, let alone by clear and convincing evidence.

Accordingly, Johnson's insufficient evidence claim fails because he has not overcome the "nearly insurmountable" burden that a petitioner faces to show that "no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt" when the evidence is viewed in the light most favorable to the government, let alone that the state appellate court acted unreasonably in finding that Johnson had not met that burden. *United States v. Grayson Enters., Inc.*, 950 F.3d 386, 405 (7th Cir. 2020).

### C.   Due Process: Leading Questions, Evidence of Young's Arrest Record, and Cumulative Error (Claims 8(a) and (c) and Claim 9)

Claims 8(a) and 8(c) assert that the prosecutor's use of leading questions on direct examination and elicitation of testimony regarding Young's arrest record denied Johnson due process. Doc. 56 at 18-19. Claim 9 asserts that Johnson was denied due process by the cumulative effect of the errors alleged in Claims 1 through 8. *Id.* at 20-21. Johnson does not

dispute any of the facts upon which the state appellate court relied in rejecting those claims on the merits, so the court will consider them under § 2254(d)(1) alone.

As noted, Claim 8(a) is procedurally defaulted as to all but the three questions that the prosecutor asked Mark to which Johnson objected as leading: (1) "And in reality you [Mark] took him [Johnson] there twice, is that correct?", Doc. 79-41 at 171; (2) "When they got back into your car, did you hear Otis Johnson say anything to Alonzo Young?", *id*. at 161-162; and (3) "And when Otis [Johnson] said that to Alonzo what did you see Otis [Johnson] and Alonzo Young do?", *id*. at 162. The appellate court held that those questions did not violate due process because the trial court sustained Johnson's objection to the first question and neither of the other two questions was "so improperly leading as to necessitate reversal, as they did not suggest the substantive answers given or refer to matters not in evidence." Doc. 79-1 at 11.

The appellate court's holding was neither contrary to, nor an unreasonable application of, clearly established federal law. Because a state court's decisions regarding evidentiary matters "generally do not implicate federal constitutional rights," "only if the state court committed an error so serious as to render it likely that an innocent person was convicted can the error be described as a deprivation of due process." *Perruquet v. Briley*, 390 F.3d 505, 510 (7th Cir. 2004). Put another way, a petitioner must show that "but for the error[], the outcome of the trial probably would have been different." *Anderson v. Sternes*, 243 F.3d 1049, 1055 (7th Cir. 2001) (quoting *Alvarez v. Boyd*, 225 F.3d 820, 825 (7th Cir. 2000)). Johnson does not meet that demanding standard here, not least because the prosecutor could have elicited substantially the same testimony by reframing its questions in a non-leading manner. *See Guest*, 655 N.E.2d at 884.

40

The same result holds for Claim 8(c). The testimony giving rise to that claim occurred when the prosecutor asked Detective Lazzara why he went to a particular site to locate Young, and Lazzara answered that it was the address listed on Young's arrest record. Doc. 79-42 at 132. As the appellate court noted, "Young's counsel objected, and the trial court struck the statement from the record and told the jury to disregard the statement, thus curing any prejudicial effect caused by the statement." Doc. 79-1 at 12; *see* Doc. 79-42 at 133 (instructing the jury to "disregard [the statement] entirely"). Moreover, after closing arguments, the court instructed the jury to disregard questions to which objections were sustained and testimony stricken by the court. Doc. 79-43 at 143-144. This defeats Johnson's claim. *See Soltys v. Costello*, 520 F.3d 737, 744 (7th Cir. 2008) (holding that the trial court's instructing the jury to "disregard issues for which objections had been sustained … negated any possible prejudice").

Johnson's cumulative error claim fails as well. As an initial matter, it is uncertain whether, under clearly established law, a due process claim for cumulative error is cognizable on federal habeas review. *See Alvarez*, 225 F.3d at 824 & n.1 (assuming without deciding that "[t]rial errors which in isolation are harmless might, when aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law," and citing an Eighth Circuit decision to the contrary). But even assuming a cumulative error claim is cognizable, Johnson's claim fails because, as the appellate court held, Doc. 79-1 at 15, he does not point to "at least two errors [that] were committed in the course of the trial," let alone that those errors, when "considered together, along with the entire record … so infected the jury's deliberation that they denied [him] a fundamentally fair trial," *Alvarez*, 225 F.3d at 824. That is because, as discussed, Claims 1 through 8 were either procedurally defaulted or do not present any constitutional error.

*See id*. at 825 (instructing courts to consider "only plain errors or errors which were preserved for appellate review" in assessing a due process claim for cumulative error).

### D.    Challenges to the 15-Year Sentencing Enhancement (Claim 10)

Johnson argues that the 15-year sentencing enhancement under 730 ILCS 5/5-8-1(a)(1)(d)(i) for first-degree murder offenses committed while the defendant was "armed with a firearm": (1) violates due process because it is "not reasonably designed to prevent gun violence" and punishes "innocent conduct"; and (2) violates the Second and Eighth Amendments.  Doc. 56 at 21-23.  Although the state appellate court issued a summary order denying Johnson's claims without explanation, Doc. 79-27 at 1-3, this court will presume that the appellate court adjudicated the claim on the merits because Johnson does not attempt to rebut that presumption.  *See Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); *see also Johnson v. Williams*, 568 U.S. 289, 298 (2013); *Lee v. Avila*, 871 F.3d 565, 571-72 (7th Cir. 2017).  As with Claims 8 and 9, the court addresses Johnson's challenge to the 15-year sentencing enhancement only under § 2254(d)(1) because the factual premises of the state court's determination are not in dispute.

The two grounds underlying Johnson's due process claim—that the enhancement is not a reasonable way to prevent gun violence, and that it unfairly punishes carrying guns outside of the home—are meritless because Johnson does not cite, and the court cannot find, any Supreme Court case that prohibits punishing crimes committed with a firearm more harshly than crimes committed without a firearm.  *See Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law [for

42

purposes of § 2254(d)(1)].") (internal quotation marks omitted); *see also Carey v. Musladin*, 549 U.S. 70, 77 (2006) (similar).  To the contrary, the Supreme Court has held that a person convicted of a crime "is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual, and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment." *Chapman v. United States*, 500 U.S. 453, 465 (1991) (citations omitted).  The 15-year sentencing enhancement is permissible because it is neither cruel and unusual (as explained below) nor arbitrary.  The Illinois legislature reasonably determined that the grave threat posed to public safety by firearm use warrants enhanced deterrence and retribution, which can be accomplished by punishing armed criminals (and those accountable for crimes committed by armed criminals) more severely.  *Cf. People v. Sharpe*, 839 N.E.2d 492, 532-33 (Ill. 2005) (holding that, "[u]nquestionably, [Illinois's] 15/20/25-to-life [firearm] enhancements [for first-degree murder] are reasonably designed to remedy the particular evil the legislature was targeting," *i.e.*, firearm use in the commission of felonies, and therefore that those enhancements do not violate due process); *Hughes v. Pfister*, 2019 WL 3825500, at *5 (N.D. Ill. Aug. 15, 2019) (citing *Sharpe*, and rejecting the habeas petitioner's claim that Illinois's 25-year-to-life enhancement for personally discharging a firearm during the commission of murder violates due process); *Alcozer v. Pfister*, 2014 WL 4947672, at *5 (N.D. Ill. Oct. 1, 2014) (same).

The state appellate court's rejection of Johnson's Second and Eighth Amendment challenges to the firearm enhancement is likewise not contrary to, or an unreasonable application of, clearly established federal law.  The Supreme Court has never held that the Second Amendment prohibits punishing crimes committed with a firearm more harshly than crimes

committed without firearms.  *See United States v. Jacobson*, 406 F. App'x 91, 92-93 (11th Cir. 2011) (collecting cases rejecting Second Amendment challenges to federal sentencing enhancements based on firearm possession); *Cencich v. Miller-Stout*, 2012 WL 4411864, at *22 (W.D. Wash. Sept. 6, 2012) ("The Supreme Court has not held that state firearm sentencing enhancements violate the Second Amendment.").  Nor, in the context of an adult offender guilty of murder, has the Supreme Court held a prison term to be cruel and unusual punishment under the Eighth Amendment.  Indeed, the Supreme Court has held that the Eighth Amendment permits death sentences for defendants convicted of felony murder, provided their role in the felony was substantial and the felony was committed with reckless disregard for human life.  *See Tison v. Arizona*, 481 U.S. 137, 158 (1987).  That holding defeats Johnson's contention that his 15-year firearm sentencing enhancement violates the Eighth Amendment.

### Conclusion

Because Johnson's claims are procedurally defaulted or substantively meritless, his habeas petition is denied.  Johnson's request for an evidentiary hearing on Claim 2, Doc. 88, is denied because that claim is procedurally defaulted.

Rule 11(a) of the Rules Governing Section 2254 Cases states that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  *See Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011).  The applicable standard is as follows:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that … includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.

*Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal quotation marks omitted).

This court's denial of Johnson's habeas petition relies on settled precedent and the application of this precedent to his petition does not present difficult or close questions, and so the petition does not meet the standard for granting a certificate of appealability. The court therefore denies a certificate of appealability.

September 30, 2021

_____
United States District Judge